**Opinion filed November 5, 2009**



# In The

# Eleventh Court of Appeals

_____

## No. 11-07-00358-CR

_____

## LARRY DALE SMITH, Appellant

## V.

## STATE OF TEXAS, Appellee

**On Appeal from the 35th District Court**

**Brown County, Texas**

**Trial Court Cause No. CR18783**

## M E M O R A N D U M   O P I N I O N

Larry Dale Smith appeals his conviction by a jury of the offense of evading arrest, following his plea of guilty to that offense. The jury found that he used or exhibited a deadly weapon in the commission of the offense. Smith had pleaded not guilty to the deadly weapon allegation. The jury, finding that Smith had a prior conviction as alleged, assessed his punishment at twenty years in the Texas Department of Criminal Justice, Institutional Division. Smith contends in a single point on appeal that the evidence is factually insufficient to support his conviction. We affirm.

In order to determine if the evidence is factually sufficient, the appellate court reviews all of the evidence in a neutral light. _Watson v. State_, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006) (overruling in part _Zuniga v. State_, 144 S.W.3d 477 (Tex. Crim. App. 2004)); _Johnson v. State_, 23 S.W.3d 1, 10-11 (Tex. Crim. App. 2000); _Cain v. State_, 958 S.W.2d 404, 407-08 (Tex. Crim. App.

1997); *Clewis v. State*, 922 S.W.2d 126, 129 (Tex. Crim. App. 1996). Then, the reviewing court determines whether the evidence supporting the verdict is so weak that the verdict is clearly wrong and manifestly unjust or whether the verdict is against the great weight and preponderance of the conflicting evidence. *Watson*, 204 S.W.3d at 414-15; *Johnson*, 23 S.W.3d at 10-11.

John C. Harper testified that he is a lieutenant in the Brownwood Police Department. He indicated that on December 17, 2006, he noticed a gold Mercury Marquis. He said he followed the vehicle and noticed that it was changing from the right lane to the left lane and the turn lane without signaling any of the maneuvers. He indicated that at 1:30 to 2:00 p.m. on a Sunday afternoon, when this incident occurred, there was quite a bit of traffic on the roadway. After he decided to stop the vehicle because of its failure to signal its turns, he turned on his lights and moved in front of the vehicle. Rather than stopping, the vehicle went around him, while rapidly accelerating. The vehicle moved to the left lane as it approached the intersection of West Commerce and West Austin, then turned right without stopping for a red light facing in its direction. Lieutenant Harper characterized West Commerce and West Austin as multilane roadways. He described West Commerce as being busy. He indicated that, when the vehicle made the right turn on the red light from the left lane, there was a car in the right lane stopped at the red light. Lieutenant Harper stated that it took him a moment to clear that intersection to pursue the vehicle, which had continued on and had accelerated. He indicated that his vehicle's siren had multiple tones to alert the public that he was approaching and requesting the right-of-way. He related that the vehicle he was pursuing continued to accelerate rapidly. He said that, at another intersection near a Wal-Mart and an Underwoods, the vehicle again made a right turn from the left lane, while facing a red light, with a vehicle in the right lane stopped at the light. He mentioned that the vehicle failed to stop at a stop sign when crossing U.S. 377, or Main Street. Lieutenant Harper stated that it was a very busy intersection that had traffic on it at the time. He related that the vehicle ran the red light at three other intersections.

Lieutenant Harper described a T-intersection at which no left turns are allowed due to a blind approach from an underpass. He said the vehicle went through the intersection really fast, making a left turn. He indicated that, while traveling down one street, the speed reached over eighty miles per hour and that it may have reached ninety miles per hour. He insisted that, on this road, they overtook several cars and met several cars coming in their direction. He said this was also true on another road.

Lieutenant Harper testified that, at an access road that he characterized as one with a great deal of traffic that moves at a high rate of speed, the vehicle narrowly missed having an accident with a pickup pulling a trailer that pulled right in front of the vehicle. He described it as a close call with a major accident. He also described a later incident in which a driver had to pull completely off the road as the vehicle and the pursuing officers approached. Lieutenant Harper identified the driver of the vehicle he pursued as Larry Dale Smith. He testified that, in his opinion, Smith was under the influence of an intoxicating substance other than alcohol.

On cross-examination, Lieutenant Harper acknowledged that Smith did not try to run over him with his car, that he did slow down at multiple intersections, that Smith did not try to get him hit by someone else, that occasionally he would drive in a way to leave more space between his vehicle and others on the road, that he did not come close to hitting the vehicles stopped in the right lane when he made a right turn from the left lane, and that he did not hit any other cars. On redirect examination, Lieutenant Harper noted that, if Smith did not want to hurt someone, the safest thing to do would have been for him to stop when the officer first tried to stop him.

Bruce Spruill testified that he is a police officer for the City of Brownwood. He said that he watched the video of the chase in this case and that, based upon his training and experience in dealing with this type of situation, it was his opinion that the vehicle as it was operated was being used as a deadly weapon. He said that there was no question about that and that he noticed on the video instances where there were close calls where members of the public very narrowly missed getting hit by Smith.

Clayton Wayne Seale, a passenger in Smith's car, testified that, when the chase began, he thought they were going to die because he thought they would get run over or run into somebody, based on the way Smith was driving. He said that there were many times during the chase that Smith drove through stop signs and red lights in a way that caused him to fear for his own life.

Joshua Dwayne Smith, the son of Larry Dale Smith and a passenger during the chase, described what happened as: "Well, we sped, kept going, dodging as much traffic as we could, almost getting hit several different times, almost ramming into other cars, and speeding pretty much." He said he was worried for his own personal safety. He indicated that he was worried that someone was going to get killed. Joshua referred to a vehicle moving on the access road that they almost collided with.

3

An examination of the video of the chase shows that, while Smith did take some precautions to avoid hitting other vehicles, there were at least two instances in which he narrowly avoided hitting vehicles at high speed.

We hold that the evidence is factually sufficient to support the jury's finding that Smith, during the commission of the offense of evading arrest, used a deadly weapon, a vehicle that, in the manner of its used or intended use, was capable of causing death or serious bodily injury. Smith urges that the evidence is insufficient because there was only a hypothetical danger to others, but no actual danger. He primarily relies on the opinions in *Drichas v. State*, 175 S.W.3d 795, 799 (Tex. Crim. App. 2005); *Drichas v. State*, 219 S.W.3d 471, 475 (Tex. App.—Texarkana 2007, pet. ref'd); *Cates v. State*, 102 S.W.3d 735, 738 (Tex. Crim. App. 2003); *Mann v. State*, 13 S.W.3d 89, 92 (Tex. App.—Austin 2000), *aff'd*, 58 S.W.3d 132 (Tex. Crim. App. 2001); and *Williams v. State*, 946 S.W.2d 432, 435-36 (Tex. App.—Fort Worth 1997), *rev'd*, 970 S.W.2d 566 (Tex. Crim. App. 1998).

We find that all of these cases either support our opinion or are distinguishable. In *Drichas*, the court did hold that, in order to justify a deadly weapon finding with respect to a motor vehicle, the danger posed to motorists must be actual, and not simply hypothetical. *Drichas*, 175 S.W.3d at 799. The court went on to say, however, that the statute does not require pursuing police officers or other motorists to be in a zone of danger, take evasive action, or require an appellant to intentionally strike another vehicle in order to justify a deadly weapon finding. *Id.* It held that a deadly weapon finding is appropriate on a sufficient showing of actual danger, such as evidence that another motorist was on the highway at the same time and place as the defendant when the defendant drove in a dangerous manner. *Id.* As we have noted, in this case many motorists were on the highway at the same time and place as Smith when he was driving in a dangerous manner, including more than one with whom he almost collided. We find *Drichas* to support our opinion.

On remand following the opinion in *Drichas*, the court of appeals held that the evidence was factually insufficient, noting that, while there may have been some traffic on the roadways of Texarkana at the time the appellant in that case was driving, the evidence was uncertain regarding the presence of other motorists, where or when they were encountered, or even whether they were on the same roadway or a nearby road. *Drichas*, 219 S.W.3d at 475-76. In the case at bar, the evidence showed that other vehicles were at or near Smith and that he almost collided with more than one of them.

4

We find the opinion in *Cates* to be distinguishable. In *Cates*, the court held that, because the case was one of leaving the scene of an accident, the relevant time period for determining whether the defendant's truck was used and exhibited as a deadly weapon was the time period after the accident. *Cates*, 102 S.W.3d at 738. The court noted that there was no evidence that the truck was driven dangerously after the accident nor was there evidence of any other traffic on the roadway nor any evidence that anyone was endangered by the truck after it left the scene of the accident. *Id.* In the case at bar, there is substantial evidence that Smith drove his car dangerously and that there was other traffic on the roadway while Smith was driving in that manner, some of which traffic was endangered by Smith's conduct.

In *Mann*, the court held that a deadly weapon finding requires evidence that others were endangered, not merely a hypothetical for danger if others had been present. *Mann*, 13 S.W.3d at 92. The opinion went on to note that the appellant in that case almost hit another vehicle head-on, but the other vehicle took evasive action. *Id.* Additionally, an experienced officer testified that the collision was capable of causing death or serious bodily injury. *Id.* The court held that the evidence was sufficient to support the deadly weapon finding. *Id.* We find *Mann* to be consistent with and supportive of our opinion.

In *Williams*, a felony driving-while-intoxicated case, the court held that the evidence was insufficient to support a finding that the appellant used his vehicle as a deadly weapon because there was no evidence that there was any other motorist on the highway at the time and place the appellant drove in an intoxicated condition or that any other motorist, other than arresting officers, came upon the scene or was endangered by the appellant's truck stopped on the highway. *Williams*, 946 S.W.2d at 435-36. As we have previously noted, there was evidence in this case that there were numerous motorists on the highway at the time and place Smith drove in a dangerous manner, more than one of which were endangered by his conduct. We overrule Smith's sole point on appeal.

The judgment is affirmed.

November 5, 2009                                                    PER CURIAM

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
McCall, J., and Hill, J.[1]

---

[1]John G. Hill, Former Justice, Court of Appeals, 2nd District of Texas at Fort Worth, sitting by assignment.